31  632
108m 510

## J. M. POWELL et al., Respondents, v. P. Y. HURT et al., Appellants.

### Kansas City Court of Appeals, July 2, 1888.

1. ADMINISTRATION—DUTIES OF EXECUTOR AS TO COLLECTION OF DEBTS.—It is the duty of the executor or administrator of an estate to diligently and speedily collect the debts due the estate, especially such as are out on personal security only, pay the debts of the deceased and distribute the residue to the heirs or legatees; and the executor or trustee will become personally liable, if he does not get in the money within a reasonable time.

2. ——— DIRECTIONS IN A WILL—DUTY OF EXECUTOR CONCERNING. When there is direction in the will as to what shall be done with the testator's effects, all question or debate is closed. The will of the testator is the law for the executor. It is a fundamental principle that a trustee accepting the trust, must comply with its provisions and an executor is a trustee in such sense.

3. ——— ——— EXTENT OF LIABILITY OF EXECUTORS, ETC., FOR DEFAULT OF DUTY.—Although the rule of law is established in this state that executors and administrators are only responsible for want of due care and skill, and that the measure of care is that which prudent men exercise in the management of their own affairs; yet this rule only applies to matters left to the discretion of the executor. If the testator has asserted his own discretion the executor must obey it.

4. ——— ——— STATUTE PROVISIONS AS TO INSOLVENT DEBTORS. Under section 240, Revised Statutes, providing that an executor shall receive credit for all debts charged in the inventory where "the debtor was insolvent, or that from any other cause, it was impossible for the executor or administrator to have collected such claim by the exercise of due diligence," the word "insolvent" is used as meaning impossibility to collect. (Julian v. Abbott, 73 Mo. 583).

5. ——— ——— DUTY OF DEMANDING PAYMENT—RULE CONCERNING. The general rule is that all debts in the inventory, not designated desperate, shall be accounted assets in the hands of the executors or administrators, and in order to escape such accountability, he must show that they are desperate, or at least show a demand and refusal. He should take legal steps to recover unless from the notorious insolvency of the debtor a suit would be unavailing. (PHILIPS, P. J., dissents in a separate opinion).

APPEAL from Macon Circuit Court, HON. ANDREW ELLISON, Judge.

*Affirmed.*

*Certified to Supreme Court.*

The case is stated in the opinion.

PEAK, YEAGER & BALL and B. R. DYSART, for the appellants.

I. The prevailing rule in the state is that executors and administrators stand in the position of trustees to those interested in the estate upon which they administer, and are liable only for want of due care and skill, and that the measure of care and skill required of them is that which prudent men exercise in the direction of their own affairs. And when the executor acts prudently in good faith for what he deems for the best interest of the estate he is not liable, though it may turn out afterwards he was mistaken in judgment. *Merritt v. Merritt,* 62 Mo. 150, 157, and authorities cited ; *Mosman v. Bender,* 80 Mo. 585 ; *Van Bikken v. Julian,* 81 Mo. 626 ; *Neff's appeal,* 57 Pa. St. 91 ; *Kellen's appeal,* 8 Pa. St. 288 ; *Watkins v. Stewart,* 78 Va. 111.

II. Applying this rule, we contend that under the undisputed facts in this case the court erred in refusing to allow the executors credit for said note of Benedict and Melones.

III. The policy of the law is to deal leniently with executors when they act in good faith, and with sound discretion, as in administering upon estates cases must arise when they are absolutely required to use their discretion. *Gamble v. Gibson,* 59 Mo. 596 ; *Julian v. Abbott,* 73 Mo. 580.

IV. An executor is not an insurer in any sense of the word. *Fudge v. Dunn,* 51 Mo. 264 ; *State ex rel.*

*v. Meagher*, 44, Mo. 356 ; *Foster v. Davis*, 46 Mo. 268.

V.   The provisions of the will with reference to the manner and time of collecting the assets and distributing the same are merely directory, and do not and cannot change the right, duties or liabilities of the executors.   See authorities cited, *supra*.

JOHN T. JONES, for the respondents.

I.   Hurt and Powell by agreement divided the notes of deceased between them for collection, but this relieves neither and each is chargeable with the negligent acts of the other as well as himself.   Williams on Executors, 1548, and cases cited ; 8 Cent. Law Jour. 63 ; 11 Cent. Law Jour. 216 ; 13 N. J. Eq. 308.

II.   An executor qualifying must follow the direction of the will implicitly or make himself liable. *Weigan's Appeal*, 28 Pa. St. 471 ; *Brenneman. v. Frank*, 58 Pa. St. 475 ; Williams on Executors [ Ed. of 1855 ] 1530, and cases cited ; *Booth v. Booth*, 1 Beav. 125.

III.   These executors, to relieve themselves, must show that this note could not have been collected while in their hands.   62 Mo. 460 ; *State ex rel. v. Taylor*, 72 Mo. 656 ; Williams on Executors, 1530 ; *Stiles v. Guy*, 4 Y. & Coll. 571, 575 ; *Williams v. Nixon*, 4 Beav. 472 ; *Tebbs v. Carpenter*, 1 Madd. 298 ; *Julian, Adm'r, v. Abbott*, 73 Mo. 580 ; *Powlson v. Johnson*, 29 N. J. Eq. 529 ; *Fisher v. Kilnous*, 18 N. J. Eq. 229 ; 16 N. J. Eq. 514 ; *Holcomb v. Holcomb*, 11 N. J. Eq. 477, 495.

IV.   An executor or administrator is held to a much stricter account than a trustee or guardian.   10 Casey, 474 ; 4 Johns. Ch. 619 ; Williams on Executors, 1530, 1537, and cases cited.

JOHN F. WILLIAMS, also for the respondents, on motion for a rehearing.

I.   The law is, that in all matters of controversy between trustee, and *cestui que trust*, we must be controlled by the terms of the instrument creating the

trust. In this case, the testator directed his personal estate to be converted into money as soon as the same could be done, and distributed amongst his children, while he left it discretionary with his executors as to the time, terms, and manner of the sale of his realty. In the matter of his personal estate, deceased's directions are plain and pointed: collect as soon as you can. Did they do it? Did they attempt to follow the directions of the testator? They don't claim that they did. They rather seem to stand upon the doctrine, that they exercised a wise discretion, in a matter in which they had no discretion. The proof shows conclusively that they made no sort of effort to collect this debt, due March 12, 1881, until February 16, 1882. That they absolutely ignored the directions of the testator and assumed the responsibility of letting the note run, and thus fixing the liability upon themselves without the shadow of an excuse for so doing. Because it is the settled doctrine of the law that if a trustee or executor departs from the directions of the instrument that creates him, he does it at his peril, and if loss accrues he is personally liable. When executors proceed without directions of the will, or an order of court, they assume the risk, and the law holds them to a strict accountability. Tiffany and Bullard on Laws of Trusts and Trustees, 629, 630; *Howe v. Earl of Dartsmouth,* 7 Ves. 137; 62 Mo. 150; Williams on Trustees, 1530.

II. If these executors had been clothed by the will, with discretionary power, in the matter of the collection of this note, then the court might say, in view of the surrounding circumstances, that they had not abused their discretion. In such case it might so find, but if it did, even in that case, it would run counter to the law as written. It cannot be said even in the absence of directions in a will, that it is prudent for executors to let an unsecured note run for eleven months after it is due, and make no effort to collect it or secure it. The law of trusts does not favor mere personal

security, but requires such outstanding debts to be collected at once, even though the testator himself created the debt by a loan (as in this case) on what he considered an eligible investment. *Powell v. Evans*, 5 Ves. 339; *Bullock v. Wheatly*, 1 Coll. 130; *Styles v. Guy*, 1 Mac. & Jer. 422; Tiffany and Bullard on Trusts and Trustees, 581. But that is not this case. Here, the testator gives them no discretion in the collection of his notes and accounts, but ordered them to collect at once; and yet they delay for eleven months. During all these months they made no effort to collect the note. They say the note is good, and let it run, that it is drawing interest. But the making of interest is not the primary object of executors in settling up estates—it is only a secondary matter. Their primary duty under the law, even in the absence of specific directions, is to collect the debts and convert them into cash. Here again these executors stray from the beaten path, and under the settled rule of law, incur a personal liability, even in the absence of instructions to collect as soon as may be. The law compels speedy collections. It directs the executor to take prudent measures for bringing all personal property of the deceased into his actual control and possession. And there is no function of his office which calls for such energy, promptness, and discretion in its discharge as this. Schouler's Executors and Administrators, 269.

III. Collection precedes, in natural order, the settlement of all debts, charges and legacies, and is the primary essential of prudent administration. And in the absence of all direction in the will, the executor must proceed at once to collect every personal debt of the testator. If parties fail or refuse to pay, the court is open, and he must see or show the insolvency of the debtor and that suit would have been unavailing, or he would be held liable. But when the will gives directions, the law tolerates no negligent performance of the duties assumed. Williams on Executors, 1806; *Bacon v. Clare* 3 N. Y. 294. And if the executor fail to follow

the directions of the will, and loss occurs, he is liable to make it good. *Clough v. Bond*, 3 M. & C. 496 ; Schouler's Executors, 336 ; *Williams v. Pettigrew*, 62 Mo. 460 ; *State ex rel. v. Taylor*, 72 Mo. 656.

IV. That a demand at any time from the twelfth of March, 1881, to the middle of February, 1882, would have brought the money—all agree in this. Was it impossible for the executors to have collected this note by the exercise of due care and diligence? Rev. Stat., sec. 240. If this is true, then under the statute law of the state, leaving out of view the directions in the will, these executors are liable. They have not acted the part of prudent and careful executors, even if left to their own discretion. But these executors were not allowed any discretionary power in the matter of collecting this note. They were ordered by the testator to collect it at once, as soon as they could—no delay was allowed—no time was given them—collect as soon as may be. The will determines the duties and liabilities of the executors in this case. An order of the probate court to delay the collection of this note eleven months would not protect them. They could have collected the note by demanding the money, and it was their plain official duty to do it. They cannot now be heard to say, after their imprudent neglect of duty, that the failure of the Macon Savings Bank and the assignment of Benedict, Melone & Company, in February, 1882, prevented them from collecting this money. They were in default, long before their failures occurred, and being out of line and already liable, these failures cannot save them. The makers of this note were doing a large wholesale grocery business in Kansas City, carrying a stock of ninety-eight thousand dollars at the time they assigned, February 16, 1882. They could have paid, and would have paid this note of only one thousand dollars at any time, had payment been demanded, and yet it was not such a note as the law allows the common administrator to leave outstanding. Common prudence in the management of trust funds forbids it ; and yet these executors, in total disregard of

the law and in disobedience of the directions of the testator, take no step, make no effort, for eleven months to collect this money.

V. With proper effort, would the money have been collected? If yes, then the executors are liable. It was the duty of the executors to follow the directions of the will. Then, if loss ensued, it would not fall upon them; but otherwise if they failed to follow its directions and by so doing, sustained loss. In order to determine the liability and duties of executors, the intention of the testator, as expressed in the will, always prevails. "There is but one safe course," the law says, "for executors to pursue, and that is, to implicitly follow the directions contained in the will under which they are appointed." *Weigan's appeal*, 28 Pa. St. 471; *Branerman v. Frank*, 28 Pa. St. 475; Williams on Executors [Ed. 1855], 1530, and cases cited.

ELLISON, J.—The defendants are the executors of the will of Henry A. Powell. The plaintiffs are a majority of his heirs. The executors on final settlement before the probate court asked credit for a note of one thousand dollars, given by C. H. Benedict, J. B. Malone, and R. A. Malone, on the ground that it could not be collected. The probate court allowed the credit and plaintiffs appealed to the circuit court where the credit was disallowed, and the executors appealed to this court.

The facts of the case are, that deceased died in September, 1880, leaving as a part of his property, the note in question. This note is dated March 12, 1880, due one year after date, with ten per cent. interest. The executors qualified September 24, 1880. Among other provisions of the will was the following: "4. I direct my executors to collect all my notes and accounts due me as soon as the same can be done, and also convert all other personal property to cash within the first year of the administration, or as soon thereafter as may be."

It appears that the makers of this note were the

proprietors of a wholesale grocery-house in Kansas City, and that Benedict and R. A. Malone attended to the affairs of that establishment in said city ; that J. B. Malone was president and manager of the Macon Savings Bank, in Macon City, where he resided. In the month of February, 1882, both the house in Kansas City and the bank in Macon City made an assignment and became notoriously insolvent. But, up to the time of the assignment, J. B. Malone was universally considered as abundantly solvent. His financial standing and ability was above reproach, and his commercial credit beyond all question. The wholesale house in Kansas City was run on his commercial standing. The bank was considered safe, and yet he was considered even safer than the bank. The evidence, however, shows that, in point of fact, he was insolvent at the time of the testator's death, and on up to the assignment. That is to say, his debts largely exceeded his assets. About four months after the note was due, one of the executors presented it to J. B. Malone, who requested him to wait awhile ; the executor, thinking he could get the money as well one time as another, waited, and never demanded the payment of the same, or took any steps for its collection, until after the assignment.

The question presented under these facts is, are the defendants entitled to a credit for this note on the ground that it was impossible to collect it by the exercise of due diligence ? Rev. Stat., sec. 240. It is perhaps well in this case to consider the duty of an executor when acting in relation to matters about which he has been specifically directed by the testator, as well as when acting without such direction. In my opinion, it is the duty of the executor, without being directed by will, to diligently and speedily collect in the debts due the estate, especially such as are out on personal security only. The duty of an executor is to pay the debts of the deceased and distribute the residue to the heirs or legatees. To do this, he must collect in the debts due the estate. It is. therefore, said that the collection

of debts due the estate, "is the primary essential of prudent administration." Schouler Exr's & Admr's, secs. 269, 308, 309. "Personal securities change from day to day; and as the death of the testator puts an end to his discretion in regard to them, unless he has exercised it in his will, the executor or trustee will become personally liable, if he does not get in the money within a reasonable time." Perry on Trusts, sec. 440. The same principle is announced in *Clough v. Bond*, 3 M. & Cr. 496; *Styles v. Gay*, 1 Mac. & G. 422; *Bullock v. Wheatley*, 1 Collyer's Ch. 130; *Tebbs v. Carpenter*, 1 Madd. 298; *Powell v. Evans*, 5 Vesey, 843; *Paddon v. Richardson*, 7 DeG., M. & G. 582; *Shultz v. Pulver*, 3 Paige Ch.; affirmed in 11 Wendell, 361; *Oglebay v. Howard*, 43 Ala. 144; *Johnson's Estate*, 9 Watts & Serg. 107. An executor, unless charged in the will, is not like a guardian, and his trust is not for the investment like that of a guardian, but he should collect in the debts. "His duty, therefore, is unlike that of a guardian. The latter is not bound to sue at once, but may leave a debt where he finds it, unless there is reason to apprehend danger; but an executor or administrator is under obligation to diligence in preparing for distribution." *Charlton's appeal*, 34 Pa. St. 473.

The foregoing authorities are only a few among many others, in both England and the United States, which hold that debts without something more than personal security must be diligently collected as soon as may be; and this without reference to a direction in the will. But when there is direction in the will as to what shall be done with the testator's effects, all question or debate is closed. The will of the testator is law for the executor. It is a fundamental principle that a trustee accepting the trust, must comply with its provisions. "When the will contains express directions what the executors are to do, an executor, who proves the will, must do all which he is directed to do as executor, and he cannot say, that though an executor he is not clothed with any of these trusts." Williams Ex'rs, bottom page 1796; Schouler Ex'rs & Admr's, sec. 382.

In *Weigland's appeal*, 28 Pa. St. 471, the court said : " We regret the loss that falls upon the surviving executor, as we are satisfied that there was no intentional neglect of duty upon his part. There is but one safe course for executors to pursue, and that is to implicitly follow the directions contained in the will under which they are appointed." In *Mucklow v. Fuller*, Jacob's Ch. 198, John Mucklow was indebted to the testatrix in the sum of five thousand dollars, and in her will she " directed her executors and trustees to get in and place the said five thousand dollars on government stock or security at interest in their joint names within three years next after her decease." It was not so collected. The Lord Chancellor said : " The will contains express directions what the executor is to do, and if he makes himself an executor, he must do all which he is directed to do as executor."

In *Booth v. Booth*, 1 Beav. 125, the Master of the Rolls said : " This is a very unfortunate case. It is to be lamented that Batekin, by inadvertence and over good-nature, should have placed himself in such a situation of responsibility as he has done. Here is a will the terms of which are perfectly distinct ; on the twenty-sixth of October, 1830, the two executors proved the will ; they took on themselves the trust and the duty of performing it. From that moment it was their duty to do all that was necessary for the conversion of the estate into money, and to see the dividends duly applied." In *Prior v. Talbott*, 10 Cush., it was said of the executor that it was " his duty to administer the estate according to the will, and such is the condition of his bond." These authorities are by no means all that may be found. From my examination of the subject I feel safe in saying that all, both text-books and reports, bear the imprint of the rule that an executor must strictly obey the direction of the testator.

I am not unmindful of the rule of law established in this state and elsewhere, that executors and administrators are only responsible for want of due care and

skill and that the measure of care and skill required of them is that which prudent men exercise in the direction and management of their own affairs. *Merritt v. Merritt*, 62 Mo. 157. But this rule, of course, only applies to matters left to the discretion of the executor. In order for such rule to have any application, the testator must have left room for the exercise of the executor's prudence and skill. If the testator has asserted his own discretion and will, the executor must obey it, otherwise the executor would be administering his own will, instead of the testator's.

Suppose a testator should direct that upon his death one thousand dollars should be paid to his nephew and two thousand dollars to his niece, and yet it could be shown that prudence would suggest that the larger sum should have been given to the nephew and the lesser to the niece, would that excuse him for such application of the money? Suppose the testator should direct the executor to loan certain of his moneys on real estate security or to invest in government bonds, will he be excused for loss consequent on loaning to individuals without security, although they appeared to be on solid financial basis and prudent businessmen were making loans to them? These questions answer themselves, and they serve as an apt illustration that the rule of prudence and skill only applies where there is room for prudence and skill under the will.

If the executors had demanded the note and been refused, and if in the *bona-fide* exercise of their judgment they had concluded the note could not be collected, and such conclusion was such as a prudent man would have arrived at in managing his own affairs, then, even though it turned out they were mistaken, they would not be liable. If the testator had directed that the executors collect all his questionable debts but not his good ones, in such event, under the evidence in this case, the executors would not have been responsible for not collecting this note, as they would have been justified in considering it good. I believe it to be beyond

question, that the executors should have collected the note in dispute if it could have been done by diligent effort.

But it is said, notwithstanding the evidence shows the makers of the note were considered by everybody to be solvent, yet in point of fact they were really insolvent. Insolvency is a very broad and general term as it relates to the different conditions of debtor and creditor. One's liabilities may be greater than his assets, in which case, he would be said to be insolvent, though he may have been in that condition for years, and yet paying all claims demanded of him. So a man may be said to be insolvent when he has nothing above exemptions which is subject to execution, and yet there are persons without number, in such condition, who are free from debt, who promptly meet every obligation and whose credit and standing is untarnished. There is, perhaps, no businessman but that in a moment can call to mind men who have no property above the exemptions, yet whose note for any reasonable sum is worth dollar for dollar. But according to the argument here, an executor would be excused from even demanding a debt from such person, notwithstanding the demand would have been complied with.

Therefore, before entering upon this question it may be well to look at the provision of the statute in this respect. It is provided (sec. 240) that an executor shall receive credit for all debts charged in the inventory where "the debtor was insolvent, or that, from any other cause, it was impossible for the executor or administrator to have collected such claim by the exercise of due diligence." There is no possible doubt but that the statute uses the word "insolvent," as meaning impossibility to collect. The insolvency must be such as that it is *impossible* to collect. The reading shows such to be the case. It says the executor shall have credit if "the debtor was insolvent, or that from any *other* cause it was impossible" to have collected the

claim by due diligence. The insolvency must be such as to make it impossible.

Such is the view of the Supreme Court of this state. In *Williams v. Petticrew*, 62 Mo. 470, HOUGH, J., says: "The question, therefore, is one of fact, as to whether it was impossible for the administrator by the exercise of due diligence to have collected these notes at any time after he entered upon the administration." Again in same case he says: "But as the burden of proof was on the administrator to establish his right to credit for this note, he should have at least made it appear, that even by the exercise of a proper degree of diligence it would have been impossible to collect it." The same rule is also announced by the approval of an instruction in *Julian v. Abbott*, 73 Mo. 580, 582. What possible excuse to a trustee can insolvency be, if he can nevertheless collect the debt by demanding it? Is it possible that an executor may know that he can get money from the debtor on demand, and yet, because of the fact that he could not force it out of him by suit, he need not make the demand? Legal proceedings are a resort when other means will not avail. Insolvency must be the *cause* of not collecting. But aside from the statute, why should insolvency excuse a demand in this case? Even though the executors had known the true condition of the payors of the note, yet they were in high credit and standing, and how could the executors know but that they would not, by some means, pay the claim on demand. Insolvency of the debtor does not excuse demand in other cases. It is no excuse for want of demand of a promissory note in order to hold the endorser. 2 Daniels Neg. Inst., sec. 1171 ; Parsons N. & B. 446. All the books say that the holder of the note cannot know by what means he may be paid if he will make demand. A man may borrow the money, his friends may pay it, he may have made special provision for the specific debt, or it might otherwise be paid. *Fugitt v. Nixon*, 44 Mo. 295.

The slightest heed to the desire of the testator

would have caused defendants to at least have demanded payment of this note. It is said in *Shultz v. Pulver*, 11 Wend. 365, that "the general rule is that all debts in the inventory, not designated desperate, shall be accounted assets in the hands of the executor or administrator; and in order to escape such accountability, he must show that they are desperate, or at least must show a demand and refusal." So in 5 Vesey, 843, the executors were held liable for a failure to make a demand, the court saying it was their duty to do so. In *Gaskell v. Harman*, 11 Vesey, 498, it is said, as a general rule, executors are under the necessity of getting in their testator's property, by all possible remedies; if any securities seem proper to be continued, the court alone, it has been said, must judge of that, and give the proper discretions; executors who take upon themselves to exercise the discretion on such points must be responsible for any loss sustained in consequence of their misplaced confidence, however good their intentions may have been. So in *Johnson's Estate*, 9 Watts & Serg., the executor failed to demand payment of a note or institute suit thereon for six months after it became due and he was held responsible for its loss, the proof showing it was collectible when due. "A mere application for payment, without more, would not have availed him. To entitle him to credit, he must, in addition, prove that he took legal steps to recover the sum due, or that, from the notorious insolvency of the debtor a suit would have been useless."

Now if we have in mind the provision of the will that the debts should be collected as soon as it could be done, it is apparent that due diligence required some effort to be made, by demand or otherwise, after the note became due, to collect; or if no such effort was made to, at least, show that effort would have been fruitless. The case concedes that there was no effort to collect; nearly the whole of the defendants' evidence is to show that the reason they did not endeavor to collect was that the payors were so thoroughly solvent and

able to pay, they supposed they could get the money at any time and so let it run. It is evident that the executors did not think an effort to collect would have been fruitless, for, as I have just said, they supposed the money could be collected at one time as well as another. The question then resolves itself to this, do the defendants show that it was impossible to collect this note as directed by the will? They unquestionably do not; on the contrary, they show beyond cavil that it could have been collected on demand.

It is well to keep in mind that the executors were in charge of the estate on March, 1881, when the note fell due; that though living in the same community with J. B. Malone, who was in daily business as a banker, whose credit and standing was unbounded, they never asked him about the note till some four months after it became due and then never demanded payment, but acquiesced in his request to wait; that they did let it run without even so much as mentioning it to him for some eight months afterwards, when the bank, of which he was president, made an assignment. Thus the loan was allowed to remain, in the face of the will directing its collection, for a year after it became due. The evidence shows beyond all cavil or doubt, that Malone would have paid the note if it had been demanded or insisted upon. That he was a man who paid all claims against him on demand, is shown by the fact that his financial standing and credit was unbounded. The evidence shows that no man ever possessed the confidence of the business community up to the moment of his bankruptcy to a higher degree. He was considered "better than the bank." His financial standing was the power which run the wholesale establishment in Kansas City with a stock of from sixty thousand to one hundred thousand dollars. Could he have had such standing, and begot such confidence, without being a debt-paying man? The direct testimony of defendants' own witnesses is that the money would have been paid if payment had been insisted upon. But besides all this, the

evidence shows directly that he was a "paying concern."
The evidence discloses as shown by the list that he owed
several notes to this estate.    The executors testify that
they collected one of three thousand dollars during this
period. . And as credit is asked for only one as uncol-
lectible, it follows, the others were also collected.

This, then, is the case: The will directs the note to
be collected as soon as it can be done; the executors
accept the trust; the note is owing by a debt-paying
man of the highest standing and credit; it becomes
due and is allowed to run without any effort of any
sort for a year, when it is lost by the total wreck of
the payors.

It should be remarked that the evidence establishing
the extraordinary character and commercial standing of
J. B. Malone, and that the note would have been paid if
demanded, comes from defendants.    They have shown
this on the theory that it was not negligence or impru-
dence in them to let the note run; but in this case it
only fixes their liability the more certainly, for it dem-
onstrates that if they had obeyed the will, the estate
would have had the money.    There is another theory
upon which defendants should not be allowed this
credit.    It is shown by the testimony, expressed in the
language of one of their witnesses, that "if payment
had at any time been demanded prior to the failure of
the bank the money would have been paid."    It is fur-
ther shown by undisputed testimony that when one of
the executors was asking Malone about the note and
Malone requested him to wait, "Hurt said it is good
and I will risk it."    In that remark, he sounded the
keynote to the situation, and in the language of the
books, if he concluded to interpose his own discretion
for that of the testator, he must accept the conse-
quences, however unexpected they may turn out to be.

I think the judgment ought to be affirmed, and
HALL, J., concurring, it is so ordered.    PHILIPS, P. J.,
dissents.

Philips, P. J., Dissenting.—It is altogether important to a correct result in the investigation of this case that the facts should be fully stated and kept in mind.

This controversy arose on the application of the executors of the estate of Henry A. Powell to make final settlement. Said Powell died in September, 1880, possessed of a large estate of real and personal property. On his deathbed he made his last will and testament. He sent for the defendant, Payton Y. Hurt, who was his neighbor and close friend, and requested him to act, in connection with the testator's son, as executor of this will. Hurt was reluctant to accept this burden. The testator wished him to accept it without taking the commission allowed to such executor by the statute ; but to receive only one and three-quarters per cent. in lieu thereof. On the instance of the testator, who had great confidence in the integrity and business judgment of Mr. Hurt, he finally consented to accept.

Among the assets coming to the hands of the executors was a note executed to the testator in his lifetime by C. H. Benedict, J. B. Malone, and R. A. Malone, dated March 12, 1880, due one year after date, for the sum of one thousand dollars, with interest from date at the rate of ten per cent. to be compounded annually, if not paid. In the final settlement offered by the executors they returned said note as insolvent, and asked credit therefor. Some of the heirs appeared and objected to this credit. Others of the heirs were willing that the executors should receive the credit. On the trial of this issue in the circuit court, whither the cause was taken on appeal from the probate court, this credit was disallowed, and the executors have appealed.

The evidence tended to show that shortly after the maturity of this note Hurt demanded payment thereof of J. B. Malone, at the Macon Savings Bank, of which bank J. B. Malone was president. The other makers of the note resided at Kansas City, engaged in mercantile

business, under the firm name of "Benedict, Malone &
Company," a firm composed of three makers of said
note.

When the note was so presented to J. B. Malone he
said, that owing to floods and high waters out west his
concern at Kansas City had been unable to make collec-
tions, and as times were a little close in Kansas City,
he requested the executor to wait on him a little while.

At the instance of this conversation, Wm.. R.
Powell—the co-executor—appeared, when Hurt advised
him of the situation, and asked him : " What about
time on the note?" or something to that effect. Powell
at first expressed the thought that "perhaps they
wanted time to get away with it." But on being advised
that J. B. Malone was on the note, he seemed satisfied,
as J. B. Malone was regarded by everybody in the com-
munity as perfectly solvent.

In the following February the Macon Savings Bank,
to the great surprise of the business community, failed ;
and on the next day the mercantile house of Benedict,
Malone & Company, at Kansas City, made an assignment
for the benefit of creditors. The note in question was
sent at once to Kansas City for suit against the makers ;
but nothing was realized on it out of the partnership
assets, as the court held this note not to be a partner-
ship obligation, and there were no partnership assets
sufficient to pay the joint creditors. It was not a note
of the bank, and consequently it was not provable
against the receiver appointed for that concern.

The evidence showed that, as a matter of fact, the
makers of this note had been insolvent for three or four
years prior to its execution. The concern in Kansas
City had in fact been doing business on the money of
the Macon Savings Bank, which they used most freely
for supporting the losing concern at Kansas City.

J. B. Malone was the active manager of the bank,
and seems to have run its affairs as if individually con-
trolled by him. Up to the time of the collapse in

February, 1882, he was universally regarded in the community as perfectly solvent. Hurt himself kept his money in this bank and lost by its failure about three thousand dollars. And the evidence shows that a part of the monies paid over to these contesting heirs by the executors at the end of the first year of their administration, was lent by them to this bank, at seven per cent. interest, and was lost by the failure. The evidence also showed that at the time of Powell's death he held other notes on Malone then past due, which Malone voluntarily paid before the maturity of the note in question.

I.   The duties of an executor are so well defined by the courts as to leave no room for controversy in this case as to the equitable rule in this jurisdiction. An executor is not an insurer of the claims coming into his hands. *Fudge v. Dunn*, 51 Mo. 264 ; *Foster v. Davis*, 46 Mo. 268. "The prevailing rule now established in this court is, that executors stand in the position of trustees to those interested in the estates upon which they administer, and are liable only for the want of due care and skill ; and that the measure of care and skill required by them is that which prudent men exercise in the direction and management of their own affairs." *Merritt v. Merritt*, 62 Mo. 157. In the Fudge case, *supra*, the court quote approvingly the following language from highest judicial authority : "This court has always treated trustees acting in good faith with great tenderness.   *   *   *   If there was no *mala fides*, nothing wilful in the conduct of the trustee, the court will always favor him. For as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of anxiety and trouble, it is an act of kindness in any one to accept it. To add hazard or risk to that trouble, and to subject a trustee to losses which he could not foresee, would be a manifest hardship ; and would deter every one from accepting so necessary an office."

In these final settlements, in determining what credits shall be given and what charges made, in favor of

and against the executor, the court exercises an especial function of equity. As said by COULTER, J., in *Kellar's appeal*, 8 Barr, 288: "It is peculiarly a branch of equity jurisprudence, where the conscience of the chancellor, enlightened and controlled by adjudicated precedents, is the umpire. * * * A court of chancery always deals with great tenderness towards a trustee, acting in good faith. * * * A slumbering credulity, or careless indifference, on the part of the trustee the law will not tolerate. He must do as a prudent man, under like circumstances, might do in his own case. It must be borne in mind that the office of administrator, executor and guardian, is one of the highest and most absolute necessity in society; and in the great majority of cases is undertaken more out of kindness and duty, than with any hope or expectation of emolument, and is attended in its faithful discharge with trouble, anxiety and hazard." So it is, in effect, said in *Neff's appeal*, 57 Pa. St. 96: All that justice, in the reasonable conservation of estates under administration, ought to exact of the administrator is common skill, prudence and caution, which an ordinarily prudent man exercises in the management of his own like affairs. This is approved by our Supreme Court in the Fudge case: "We look upon the administrator as the representative of the deceased, and if the deceased if alive, and acting as a prudent man, could not have prevented the loss, his representative ought to be exonerated under the like circumstances." If these rules are to be recognized in the consideration of this case I do not perceive how the executor is to be made liable for the loss of the money on the note in question. That he acted just as the intestate himself would have acted, if living, in respect of this debt, is manifest. At the very time of Mr. Powell's death he had money loaned to Malone then past due, showing his confidence in Malone's solvency. That Hurt in indulging Malone as he did acted just as an ordinarily prudent man would have acted in his own affairs is beyond debate. And this is the rule laid down

by our Supreme Court, for the determination of this case. No other standard of diligence can be erected by this court.

II. The evidence shows that no man in that community enjoyed its entire confidence more than Malone. His credit seemed unlimited up to the hour of the final collapse of the bank. No one was pressing or suing him, to excite any apprehension on the part of Hurt, or to stimulate him .to any special effort. He left his own money with this bank, just as these complaining heirs did their private money. The executor manifested proper diligence, for he did on the maturity of the note present it for payment. The excuse given by the debtor for not paying it then was a most reasonable one, and there was nothing in it whatever to excite any suspicion. The co-executor Powell, while apparently willing in this controversy that his share in the fund when distributed should be increased by mulcting Hurt (as he thinks Hurt would bear the loss, as he took the note for collection), yet, when he knew that Hurt was about to grant further time, or not to sue, he indicated his acquiescence when informed that J. B. Malone was on the note, thereby emphasizing the popular confidence in Malone's solvency, and approving the course taken by Hurt. That ninety-nine men out of a hundred, of prudence and care, would have acted in this matter just as Hurt did is too palpable for argument. The note was bearing ten per cent. interest compounded. There was no exigency of the estate demanding the collection of the money. A distribution was made among the heirs during the first year, and these very contestants loaned the money, or a part of it, to Malone's bank at seven per cent. interest. so that the probabilities are that if Hurt had collected this note the money would have gone back into the same place whence it came, and been there lost.

III. It is contended that it was the imperative duty of the executors to sue on this note immediately on its maturity. We need not controvert the general proposition that it is the duty of an administrator to convert

into money *choses* in action. But we wholly deny that it is a fixed rule that, under any and all circumstances, this should be done, and if not so done the administrator acts at his own peril. No court has ever laid down such a rule. The very authority relied upon by respondents (*Charlton's appeal*, 34 Pa. St. [10 Casey] 475) says: "We do not desire to be understood as holding, that an administrator is bound to sue immediately a debt due his intestate, or encounter the hazard of personal liability for it ; such is not the rule, but he is responsible for the want of ordinary diligence. When he has suffered years to pass by without any effort to collect such debt, or offering any excuse for his failure to proceed * * * we will not reverse the judgment." The facts of the case at bar bring it within the very terms which the opinion says will excuse it. If the rule were otherwise, it would run counter to the rule established by our Supreme Court, of establishing the administrator's liability by the test of what an ordinarily prudent man would do under like circumstances. It recognizes the right of exercising a discretion in every case, subject to the limitation as to its reasonableness, to be ascertained by the standard which governs the action of men, of common prudence, similarly situated.

Much has been said, both in the brief and oral argument of respondents' counsel, about the following clause in the testator's will : "Fourth. I direct my executors to collect all my notes and accounts due me as soon as the same can be done, and also convert all other personal property to cash within the first year of the administration or as soon thereafter as may be. I also direct my executors to sell my real estate just as soon as it can be done, and when the money is received, likewise distribute it among my children ; and I leave the time, terms and manner of sale to the sound discretion of my executors, and give them express authority to execute, acknowledge, and deliver the necessary deeds of conveyance for said real estate."

It was at first contended that this provision made it

absolutely mandatory on the executors to collect all the notes of the estate within the first year of administration. This was not tenable, for the obvious reason, that the direction as to the collection of notes and accounts was to do so "as soon as the same can be done." The direction as to the first year of the administration was as to the conversion into cash of "all other personal property;" and even as to that there was the qualification, "or as soon as may be done."

The first direction as to collecting notes and accounts was nothing more than what the law itself imposed, which is, that executors should proceed to collect debts due the estate promptly. And this remits us back in the discussion to the rule of reasonable discretion, and whether or not the executors in not bringing suit acted with that degree of diligence and prudence which a reasonably prudent man exercises under like circumstances. The evidence shows that within the first year of the administration a conference was held between the executors and heirs as to whether the land should be sold, and the estate wound up within that year. It was determined that it would not be for the best interest of the estate to do so. As there was no need of money to carry on the administration, and no money demanded by the heirs, and they were loaning the money distributed to them under the will to this very bank at a lower rate of interest than this note was bearing, and there was not even a suspicion of Malone's insolvency, the discretion exercised by the executors in not pressing the collection of this note was most reasonable, and was such as any prudent man would have shown under like circumstances.

IV.   The authorities cited on behalf of respondents respecting the liability of trustees where they depart from the provisions of the trust instrument as to the manner of managing and investing the trust fund, or in changing the trust property from one character to another, have no application whatever to the facts and law of this case. In the case of such departures the trustee

acts at his own peril, if the change or adventure prove disastrous.

V. The foregoing discussion has proceeded upon the hypothesis that this note could or might have been collected had the executors pressed its collection within the year. But the executors' claim to this credit rests upon a yet firmer ground, upon which there can be no possible legal or equitable assault. The uncontradicted evidence shows that during the whole time of this administration Malone was hopelessly insolvent. No witness pretended otherwise. The only witnesses who spoke to this matter were Rubey and Dysart. Rubey testified as follows: "All the makers of the note in controversy were insolvent prior to the death of Powell, and have continued to be so. As a matter of fact I do not believe the note in question could have been made by law out of the property of the makers at any time since the death of Powell; but if payment had been demanded prior to failure of the bank the money would have been paid, but it might have been with some other person's money. They might not have stood a suit for one thousand dollars. They might have paid it rather than been sued, but if so, it would have been paid out of the Macon Savings Bank with the bank's money."

Dysart testified: "Benedict and Malone were both insolvent during this administration. From my personal knowledge I am satisfied this could not have been made out of the makers thereof, or either of them, by law. If paid at all it would have been paid by the Macon Savings Bank. * * * There was nothing else to pay it with."

This is the whole of the evidence on which it is sought to hold these executors to account for a debt now of over two thousand dollars, on the ground of official neglect of duty. And what is this evidence, but the mere conjecture that Malone might have paid, in the opinion of the witness, if pressed, but the money would have been taken by him from the bank. He had no property, no money of his own; and if perchance he

had met the conjecture of the witness—a bare supposition—it would have been done by wrongfully taking the funds of other people entrusted to the bank, and misapplying them to the payment of an individual debt. What right had the witness to presume that Malone would have thus committed a flagrant breach of trust? And upon what ethics, recognized by a court of chancery, should we feel constrained to adopt the mere opinion of the witness and predicate a decree upon such *mala fides* of this bank officer?

I submit that a court of equity, administering justice *ex aequo et bono*, ought not to adopt such a rule This evidence is not the proof of any substantial, reliable fact. No man's property, which it is the design of the law and the office of the courts to protect, should be swept away from him on mere conjecture—the mere speculation of a witness, when there is no possible means of ascertaining its truth. The supposition of the witness may or may not be well founded. How is a court to determine in advance whether it is or not? We might render judgment on such conjecture when the fact was, the debtor might not be thus scared into payment, or when he may have been unable or unwilling thus to wrong the bank? The property of the executor would under such a ruling be at the mere caprice—the opinion—of an irresponsible witness.

It is a fundamental rule of evidence that a witness must speak to actual facts, or not at all. Except in the instance of expert testimony, where the fact sought to be established is out of the range of tangible proofs, depending on some matter of science, or special experience, the mere opinion of a witness is incompetent; because it is an assumption of the province of the triers of fact, and because of the danger of basing a judgment on naked conjecture and surmises, instead of on existing facts. The witnesses who volunteered this speculative opinion gave no data, no tangible fact, for such surmise. There was not one word of proof that Malone had been coerced to make a single payment after

the maturity of this note by any such threat. There is no evidence in this record that he had made any payment on any of his vast indebtedness maturing after this debt. The expressed opinion of the witnesses as to what might have happened, was not based upon, nor accompanied with, the presentation of any reliable fact to warrant any court in founding judgment thereon.

VI. I have always understood the law to be in the matter of such final settlements that, where the executor or administrator showed that the debtor was insolvent during all the time of his administration, he was entitled to the credit as a matter of course. And no case has been cited, after two arguments at this bar, where an administrator or executor has been denied the credit in such case. To hold him to an accountability for a failure to collect "as soon as can be done," when it appears that a resort to a suit, judgment, and execution, would be unavailing, would be to hold him to the letter of the law when the law itself afforded him no means of protection. If A should place claims in the hands of B to collect immediately, the implication of law would be, that he should have recourse to legal process as the effectual means to the end. And when he should show, when called upon by A for an account of his stewardship, that the debtor at the time he received the claim for collection was, and yet is, insolvent, his defence at law would be complete.

In *Potter v. McDowell*, 31 Mo. 73, it is declared: "That if all a man's debts cannot be collected by legal process out of his own means he is insolvent. * * * Whenever it is shown that a suit against an individual for a demand would be unavailing he is insolvent." In such case no return of *nulla bona* is required.

Our own statute recognizes the insolvency of the debtor as an unqualified excuse for failure on the part of the administrator or executor to collect. Section 240 provides, that: "At his final settlement, the court shall give credit to the executor or administrator for all the

debts which have been charged in the inventory as due to the estate, if the court be satisfied that such debt was not really due to the estate, or that it had been balanced or reduced by offsets in any court of competent jurisdiction, *or the debtor was insolvent*, or that, from any other cause, it was impossible for the executor or administrator to have collected such claim by the exercise of due diligence." This statute in unmistakable terms declares that, if the "debtor was insolvent," the "court shall give credit to the executor or administrator." The court has no discretion in such case, for thus saith the law-making power of the state. The fact of insolvency of the debtor as much entitles the executor to the credit as if it appeared the debt was not really owing to the estate, as if it had been balanced or reduced by offset in a court of competent jurisdiction. These excuses for not collecting lie alongside of each other in the section of the statute, and the one is just as obligatory as the other on the probate court. To these unqualified grounds of excuse, entitling the executor to the credit, is added "any other cause," rendering it "impossible for the executor, etc., to have collected such claim by the exercise of due diligence."

The case of *Williams Adm'r v. Heirs of Petticrew*, 62 Mo. 460, is cited in support of the proposition, that it devolves upon the executor to show affirmatively that, notwithstanding the insolvency of the debtor, he could not have collected the debt by the exercise of proper diligence. This is an entire misconception of the opinion. There were two debts for which the administrator asked credit. One was against a man named Clark, the other was against one Gilliam. Of the Clark debt the court say: "In regard to the Clark note, the testimony is conclusive, that from the time this note came to the hands of Williams as administrator, in 1861, Clark was and continued to be insolvent. We have no doubt about the propriety of allowing the administrator credit for this note." The court then proceeded to show that in respect of the Gilliam note there

is more doubt, because the evidence did not show that during the whole time the administrator held it Gilliam was insolvent. When the administrator first had this note the debtor was not shown to be insolvent, and even after it came again into the hands of the administrator, the evidence shows, the administrator had secured, through a land trade, a debt due to the estate and a debt to himself. The evidence tended to show that there was a time during the administrator's possession of the note that he might have secured a part of it at least, as he secured part of an individual debt, out of the property of the debtor. It was in respect of this state of facts that the court said: "But as the burden of proof was on the administrator to establish his right to credit for this note, he should have at least made it appear, that even by the exercise of a proper degree of diligence it would have been impossible to collect it." As to the Gilliam note, it is manifest it came under the last clause of said section of the statute, "any other cause." But as to the Clark note, the testimony showing Clark's *insolvency* from the time the note came into the possession of the administrator, he was entitled to the credit as a matter of course.

The principles of law upon which I base my conclusions in this case have been recognized by the Supreme Court recently, in *Booker v. Armstrong*, 93 Mo. 49. The court again affirm the rule, that the measure of diligence required of an administrator is that which "a prudent man exercises in the direction of his own affairs." In that case the note which came into the hands of the administrator was secured by a deed of mortgage on real estate. The debtor was otherwise insolvent; and the court say: "But the Grove estate could not have suffered any loss by reason of the failure of the executor to prosecute a personal action against Pogue [the debtor], for *he was and still is insolvent.*" Thus again recognizing the principle that insolvency is a complete answer for the executor to make to a demand that he should account for such debt. But inasmuch as

the executor held the note and mortgage for a number of years, without any effort to foreclose the mortgage, and negligently permitted the security to depreciate in value, he was held accountable to the extent of such depreciation.

VII. Against all this, the only argument interposed is, that the executor might possibly have induced the insolvent debtor to pay this note, not out of the property he owned, but by taking the money out of the vaults of the bank, held as a trust fund, and misapplying it to his individual debts. This he could only do in .violation of a high trust, and in effect robbing his depositors to pay another man's debt. It occurs to me · that a decision of a court bottomed upon such questionable morality would not be creditable.

VIII. On the other hand it seems to me that if ever there was a case where the salutary and reasonable rule of equity laid down by Lord Hardwicke should be applied this preëminently is one : " If there is nothing wilful in the conduct of the trustee, no *mala fides*, the court will always favor him. To subject him to losses which he could not foresee would be manifest hardship, and would be deterring every one from accepting such office." Not only that, but the respondents seek to make this executor answerable when it is in proof that he could not have made this debt by legal process. Every consideration of equity is in favor of Mr. Hurt in this · controversy. Mr. . Powell was his neighbor and friend, and pressed upon Mr. Hurt the acceptance of the burden of this administration against his wishes. He yielded only to oblige the dying request of his friend ; and accepted the labor and responsibility for the meager pittance of one and three-fourths per cent. commission, when the statute would have allowed five per cent. Hurt was faithful to his dead friend and his heirs. He administered the estate with marked success and promptness ; and turned it over to the distributees in good time, and with unusual small loss. For the heirs, under all the facts and circumstances surrounding

this case, to demand that Hurt shall make good the one thousand-dollar note, with its accumulated interest, compounded, more than doubling the principal, is contrary to common right, and the dictates of an enlightened conscience.    I cannot consent to the wrong and injustice.

The majority opinion being in conflict, in my opinion, with the line of decisions of the Supreme Court cited in this opinion, I ask that the cause be certified to the Supreme Court; which is accordingly done.